Lloyd S. Elder and Laura Elder v. Commissioner.
Elder v. Commissioner
Docket No. 11077.
United States Tax Court
1950 Tax Ct. Memo LEXIS 292; 9 T.C.M. (CCH) 59; T.C.M. (RIA) 50018; January 26, 1950, Decided *292 Commissions earned by petitioner, who was on a cash basis, under his contract with Peloian for the purchase of raisins during the 1944-1945 season were not payable or available to him in 1944 and hence were not taxable to him in that year. 2. Petitioner acted as distributing agent of Peloian in making over-ceiling payments to growers who sold raisins to Peloian. He derived no income from so doing. 3. Petitioner established a check-cashing business, charging for such service 25 cents per hundred dollars. During 1944 he cashed eight checks payable to John Carlson aggregating $84,253.75 and representing the sale of raisins to B. Cribari & Sons. There is no element of income to petitioner in the transactions except the charge made for cashing the checks. 4. Petitioners are not subject to the fraud penalty imposed by the Commissioner. Clyde C. Sherwood, Esq., for the petitioners. E. A. Tonjes, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined a deficiency of $75,408.10 in the petitioners' income tax liability for the year 1944. He also imposed a fraud penalty of $37,704.05 for the same year. He assessed $35,846.41 of the income tax liability and $17,773.21 of the penalty as jeopardy assessments under the provisions of section 273 of the Internal Revenue Code. In his amended answer, the respondent claimed a deficiency of $37,669.28 and a penalty of $18,834.64 in lieu of the deficiency and penalty asserted in the notice of deficiency. The issues are: 1. Were the commissions earned by the petitioner on the purchase of raisins for the Peloian Packing Company, during the 1944-1945 raisin season, taxable to him in 1944? 2. Did the petitioner receive taxable income through the distribution of over-ceiling payments for *294 the Peloian Packing Company? 3. Did the sum of $40,923.25 received from B. Cribari & Sons for the purchase of raisins, covered by checks of that concern, payable to John Carlson, endorsed by him and the petitioner and deposited in the petitioner's bank, constitute income taxable to the petitioner in 1944? 4. Was the fraud penalty properly imposed? Findings of Fact The petitioners are husband and wife and reside in Fresno, California. They filed a joint income tax return for the taxable year with the collector of internal revenue for the first district of California. They are on a cash basis of accounting. Hereafter, Lloyd S. Elder will be referred to as the petitioner. The petitioners' return showed a gross income of $2,753.77 for the calendar year 1944. This sum was composed of wages received from C. I. Wright, $283.46; salary from the State of California, $1,809.68; and miscellaneous income from commissions and escorting duty, $660.63. The return also listed medical and dental expenses as $246. Five per cent of the petitioners' gross income was $137.68. The resulting difference of $108.32 was claimed by the petitioners as a deduction. The respondent disallowed such deduction *295 on the ground that he had increased the petitioners' income to $104,345.12, five per cent of which was far greater than the petitioners' medical and dental expenses. The petitioner was born in Fresno. He has an extensive acquaintanceship in the valley towns of that region. He has lived his entire life in Fresno except while he was on tour as a professional motorcycle racer and hill climber in the United States, Australia, England, Europe and South America. In 1944 he was a traffic officer employed by the California Highway Patrol. After July, 1944, he was on leave, due to injuries suffered in 1934, and, on February 1, 1945, he was retired from duty with the California Highway Patrol on account of such disability. During the latter part of 1944 the petitioner was engaged in the business of buying dried fruits and raisins for various packing companies. At that time he entered into an agreement with Mard H. Peloian, an individual doing business as Peloian Packing Company, hereinafter called Peloian, whereby he agreed to purchase raisins for Peloian on a commission of $2.00 per ton (later reduced to $1.50 by mutual consent), plus expenses. Payments to buyers, including the petitioner, *296 were not made immediately after delivery but only after the season was over. Deliveries were completed and numerous adjustments were made. Such procedure is a custom in the industry. Peloian was not obligated to pay the petitioner on December 31, 1944, for the tonnage which had been delivered at that time pursuant to the contract. If the petitioner had needed the money, Peloian would have made him an advance payment. The petitioner negotiated 70 or more contracts with approximately 60 growers for the purchase of raisins for Peloian, to be delivered during the 1944-1945 season or "crop." Some of the contracts were made in 1945. In the majority of the contracts, the petitioner made adjustments of tonnage and payment for raisins with the growers during the year 1945. During the 1944-1945 season, the petitioner purchased approximately 3,757 tons of raisins for Peloian. In the early part of 1945 (in March or April) the petitioner and Peloian made a final reckoning of the amount due to the petitioner under his contract, including the amounts expended by him in making over-ceiling payments, and determined it to be $5,635. No part of the commission due to the petitioner was paid in 1944. *297 At the end of 1944, Peloian did not know how much was or would be due to the petitioner as commissions on purchases. The contracts with the growers were made in October, November and December of 1944 and in January and February of 1945. The delivery thereunder continued from 30 to 60 days from the date of the contract. Deliveries on some contracts were made partly in 1944 and partly in 1945. It is customary in the packing business to settle with buyers on commission at the end of the season. No part of the commissions payable to the petitioner by Peloian was due or available to the petitioner in the year 1944. An order of the War Food Administration restricted the use of certain varieties of grapes grown in eight counties of California to processing them into raisins. The price fixed therefor was $180 per ton. Cooperative associations were permitted to collect an additional $25 per ton. There was no ceiling established by the War Food Administration governing grapes or raisins not covered by the order. Wineries paid as high as $350 per ton for such grapes or raisins for the purpose of fortifying wine. Many growers felt that the War Food Administration was discriminatory and unfair *298 and refused to sell for the ceiling price established by it. Peloian purchased grapes and raisins from the recalcitrant growers and paid to them the ceiling price on or after delivery. At the time of purchase, Peloian paid to them a supplementary or "over-ceiling" price of from $7 to $12 a ton. The petitioner disbursed such supplementary payments for Peloian and also expended additional amounts as expenses. During the 1944-1945 season he so disbursed on behalf of Peloian the sum of $47,472, including $7,500 of his own money which he advanced for Peloian and which was later repaid to him by Peloian. All of the $39,972 (excepting $2,000 which is hereafter described) so expended by the petitioner was the property of and belonged to Peloian and was paid under the direction of Mard H. Peloian. The petitioner retained no part of the amount so disbursed. The petitioner expended for Peloian's benefit the entire amount of $47,472 received from Peloian or advanced by the petitioner. At the settlement, the petitioner reported to Peloian that he had paid the $2,000 to George Moradian, also a raisin buyer. On previous occasions Moradian had advanced money to the petitioner to pay supplementary *299 payments to growers who furnished raisins to Peloian. Peloian refused to recognize his obligation to account to the petitioner for the $2,000 so paid, on the ground that petitioner had no authority to make such a payment. Moradian never repaid the $2,000 to either the petitioner or to Peloian. On December 9, 1944, the petitioner opened a special checking account with the Security First National Bank of Los Angeles, Fresno Branch, with a deposit of $10,000. Of this sum, $7,500 was the petitioner's own money and he borrowed the remaining $2,500 from W. J. Fortier, giving a note therefor, which he later repaid. At the time of borrowing, the petitioner told Fortier that he was going to start a check cashing business. On December 21, 1944, the petitioner deposited in the special account a check for $1,399.09 issued by Peloian to Kalian & Tatosian for over-ceiling truck hauling. The check was made payable to a truck driver employed by Kalian & Tatosian who owed the driver considerable money. The petitioner cashed the check through his special account and gave the proceeds to Kalian & Tatosian, less a commission of six or seven dollars. On December 30, 1944, the petitioner deposited a check *300 for $3,266.40 issued by the Fresno Trading Company for a supplementary payment to Melikian Brothers. It was cashed by the petitioner. The petitioner also deposited in the special account a check for $5,000 payable to Peloian and issued as a part of the supplementary payment fund supplied to the petitioner by Peloian. The remaining seven deposits made in the special account consisted of eight checks issued by B. Cribari & Sons, hereinafter called Cribari, aggregating $84,253.75 and payable to John Carlson. In December, 1944, Cribari was in desperate need of raisins to be used to produce the alcohol needed in processing wines. Albert Halverson, weighmaster and assistant to the superintendent of Cribari, was told by George Moradian that the latter had raisins available. Moradian stated that he also handled the raisins for John Carlson. Upon obtaining the approval of Cribari, Halverson, for Cribari, purchased large quantities of raisins from Moradian. The weigh tags were made out in the name of John Carlson, as requested by Moradian. Checks were then made out by Cribari, payable to Carlson, to cover the weigh tags. The Carlson checks heretofore mentioned were cashed by the petitioner. *301 He charged a commission of 25 cents per hundred dollars for his services in cashing the checks. In his notice of deficiency the respondent added to the petitioners' income the sum of $104,345.12 composed of the following items: Profit on sale of raisins to B. Cribari
and Sons
$ 40,923.25
Over-ceiling funds - Peloian Packing
Co. (net)
21,770.00
Commissions on raisin purchases
7,514.38
Miscellaneous over-ceiling payments
received
34,137.49
Total
$104,345.12
The income tax return of the petitioners for the year 1944 was neither false nor fraudulent and they are not subject to the penalty as provided in section 293 (b), I.R.C., and as imposed by the Commissioner. Opinion VAN FOSSAN, Judge: There are involved in the case before us three major issues and the concomitant issue of fraud. The first issue presents the taxability of $7,514.38 determined by the respondent to have been the amount which the petitioner "earned" as commissions on the purchases of raisins made by him for Peloian during the taxable year. The petitioner contends that in 1944 he received no such sum as his commissions; that no definite amount due to him under *302 the contract with Peloian was or could have been ascertained during that year; and that no constructive or actual receipt of the commissions was accomplished by the petitioner until March or April, 1945. The respondent argues that the stated amount was available to the petitioner and could have been demanded and received by him during the taxable year. The record supports the petitioner's contention. It is the custom of the industry to pay purchasing agents their commissions at the conclusion of the season when the current crop is harvested, sold and delivered. The season covered by the petitioner's contract with Peloian extended well into 1945. In fact, some of the petitioner's purchases from the growers were not made until after January 1 of that year and deliveries thereunder usually required from 30 to 60 days to be completed. Many adjustments were required, including making supplementary payments, and many duties had to be performed by purchasing agents such as the petitioner, in order to determine the quantities of usable raisins purchased, the amount due to the growers and hence the amount of the commission to which the petitioner was entitled. The uncertainty attendant *303 upon the many factors incident to proper completion of the contracts and upon the performance of the petitioner's duties makes it unmistakably apparent that no settlement with the petitioner was or could have been made by Peloian before the spring of 1945. There is no provision in his agreement with the petitioner for even a partial settlement of the commissions during the taxable year. The respondent's own regulations [1] as applied to the facts of record make it doubly clear that the petitioner received no commissions constructively. No amount due from Peloian was credited to the petitioner on Peloan's books or set apart for him in any manner. Van W. Peabody, 5 T.C. 426. Nor was there any indication on Peloian's books that any sum was due and payable to the petitioner. In fact, Peloian denied categorically that he was under any obligation to pay the petitioner any definite amount until the final settlement. In view of these facts, it is clear that the petitioner received no commissions from Peloian during the taxable year, either actually or constructively, and we so hold. *304 The second issue relates to the sum of $9,072 (reduced in the respondent's brief from $12,338.40, as charged in his amended answer). In his amended answer the respondent arrives at this amount of alleged income by charging the petitioner with overceiling funds of $43,238.40 received by him from Peloian, deducting disbursements of $30,900 and leaving "net funds retained" amounting to $12,338.40 which he asserted constituted income to the petitioner. He concedes that the difference of $3,266.40 represented the amount paid to George Moradian and paid by him to Melikian Brothers as an over-ceiling payment. The record shows that during the raisin season of 1944-1945, Peloian entrusted to the petitioner funds amounting to $47,422, including $7,500 of the petitioner's own money advanced for Peloian's benefit. It shows also that the petitioner expended the funds so entrusted to him in paying to growers overceiling or supplementary payments due from Peloian, as set forth in the findings of fact. He neither retained nor used any part of such funds for his own benefit. He settled this trust account with Peloian in the early part of 1945 and "accounted for every penny of it" as stated by Peloian. *305 We have no doubt that the transaction was undertaken and concluded precisely as the petitioner and Peloian testified. Consequently, we find no element of income therein and sustain the petitioner's contention in the second issue. In the third issue the respondent asserts that the petitioner realized income in the sum of $40,923.25 from the sale of raisins during the taxable year. The facts alleged to support this theory are briefly as follows: B. Cribari & Sons purchased large quantities of raisins in 1944. In payment therefor Cribari issued eight checks of the aggregate face amount of $84,253.75. These checks were all made payable to John Carlson. George Moradian made the deal ostensibly for Carlson for whom, he told Cribari, he was selling raisins. The weigh tags were made out by Cribari in Carlson's name and consequently the checks were made payable to him. The petitioner did not appear in the transactions until the checks were cashed by him. He was in the check cashing business, charging a commission of 25 cents per hundred dollars. He treated the Carlson checks in a like manner. The respondent computed a profit of $40,923.25 and ascribed it to the petitioner. We find no *306 basis in fact for such action. The mere fact that a taxpayer has made large bank deposits, unaccounted for or unexplained, may give rise to a suspicion of unreported income but in the case at bar the petitioner has presented adequate and well supported explanation of his actions in relation to the Cribari checks. The respondent asserts that Carlson was "beyond any reasonable doubt… merely a figment of Elder's imagination." The record indicates clearly the existence of a man named John Carlson. He was known to and had dealings with several witnesses whose testimony was not challenged. We find no suggestion that the petitioner was the real owner of the huge quantities of raisins which Cribari bought from and paid to the nominal seller, Carlson. The petitioner was very actively engaged in his capacity as the purchasing agent for Peloian. His position as such agent would be inconsistent with the alleged ownership of the raisins sold to Cribari. We also observe that on the same day or shortly thereafter, the petitioner withdrew from his bank account sums, in round numbers, approximating the amounts credited to his account through the Cribari checks. These withdrawals obviously constituted *307 the "cash" capital which he used to cash subsequent checks. The record and the inferences properly to be drawn therefrom sustain the petitioner's position that he was acting merely as a "check casher" and had no personal interest in the sales to Cribari or the profits therefrom. Therefore, we hold that the petitioners are not taxable on any income derived from the sale of raisins to Cribari. We found as a fact that the petitioners' return for the taxable year was neither false nor fraudulent. Consequently, they are not subject to the statutory penalty. Decision will be entered under Rule 50. Footnotes
1. Regulations 111: Sec. 29.42-2. Income Not Reduced to Possession. - Income which is credited to the account of or set apart for a taxpayer and which may be drawn upon by him at any time is subject to tax for the year during which so credited or set apart, although not then actually reduced to possession. To constitute receipt in such a case the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and must be made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition. A book entry, if made, should indicate an absolute transfer from one account to another.↩